# EXHIBIT 2

SEWAGE SERVICE CONTRACT

CITY OF DETROIT -.CITY OF HIGHLAND PARK

THIS AGREEMENT is made this _____ day of _____,
1982, between the CITY OF DETROIT, a municipal corporation
organized under the laws of the State of Michigan, by its Board
of Water Commissioners (hereinafter referred to as the
"BOARD"), party of the first part, and the CITY OF HIGHLAND
PARK, a municipal corporation organized under the laws of the
State of Michigan (hereinafter referred to as "HIGHLAND PARK"),
party of the second part.

WITNESSETH:

WHEREAS, the BOARD operates a wastewater treatment
works which is composed of a sewage treatment plant, located in
the City of Detroit at 9300 West Jefferson Avenue, along with
certain appurtenant interceptors and pumping stations, located
principally at various places within the City of Detroit, but
some of which are located outside the City of Detroit, which
are necessary to transport the sewage to the treatment plant,
and

WHEREAS, the BOARD has at various times entered into
contracts with a number of suburban communities whereby the
BOARD has agreed to make available its treatment works to pro-
vide sewage treatment and disposal service to the suburban com-
munities, and the suburban communities have agreed to pay rates
established by the BOARD for providing such service, and

WHEREAS, these sewage service contracts are for the
protection of the public health, safety and welfare of the
people in the community, in the county, in the state, in the
nation and neighboring nations, and

WHEREAS, the BOARD has provided wastewater treatment and disposal service to the CITY OF HIGHLAND PARK without a formal written contract, the parties having been guided in their legal relationship by the Opinion of the Michigan Supreme Court in the matter entitled City of Detroit v City of Highland Park, 326 Mich 78 (1949), and

WHEREAS, the calculation and allocation of costs of providing sewage treatment and disposal service, including transportation of the sewage, have been the subject of some disagreement between the BOARD and the suburban communities, and the rates and charges resulting from the calculation and allocation of costs have been the subject of litigation, and

WHEREAS, in an effort to avoid further litigation about rates and charges for sewage treatment and disposal service, including transportation of the sewage, the BOARD and all of the suburban communities then under contract for such service, entered into a Settlement Agreement which was filed in the United States District Court for the Eastern District of Michigan on July 19, 1978, (hereinafter referred to as the 1978 Settlement Agreement) and

WHEREAS, the 1978 Settlement Agreement contains rate making principles which shall govern the methods of calculating and allocating costs and the resultant rates and charges, and the Settlement Agreement also requires that all service contracts shall be amended to incorporate these rate making principles therein, and

WHEREAS, an Amended Consent Judgment was entered in United States District Court Civil Action Numbers 77-71100 and 80-71613 which required all communities and agencies under contract with the City of Detroit for sewage treatment services to

2

enact and diligently enforce sewer use and industrial waste control ordinances consistent with and at least as stringent as those of the City of Detroit, and

WHEREAS, a Settlement Agreement filed with the United States District Court for the Eastern District of Michigan on August 26, 1980 resolved matters of rates, allocation of the costs of the interceptor collapse at the intersection of Hayes and 15 Mile Road, User Charge System, Industrial Cost recovery and other matters related to rates effective January 17, 1980, (hereinafter referred to as the 1980 Settlement Agreement) and

WHEREAS, a Settlement Agreement filed with the United States District Court for the Eastern District of Michigan in May, 1982 resolved matters of rates, allocation of the costs of the interceptor collapse in the Edison Corridor, Sterling Heights, Michigan; amended in part, paragraph 5B of the 1978 Rate Settlement Agreement dealing with the principle of maximum debt financing in connection with application of the additional bond test required by Section 10 of Ordinance 517-E of the City of Detroit, and other matters related to rates effective during the fiscal year July 1, 1981 through June 30, 1982 (hereinafter referred to as the 1982 Settlement Agreement), and

WHEREAS, the United States Environmental Protection Agency has given the Board approval under the Step 3 grants provisions of Public Law 92-500 and Public Law 95-217 conditioned upon the signing of the service agreements between the Board and each contract customer providing for implementation of satisfactory user charge systems, sewer use ordinances or regulations and the Board's Industrial Cost Recovery System by each community served by the BOARD, and

3

WHEREAS, the Court in Civil Action No. 77-71100 issued an Order Re Service Contract Amendments dated April 15, 1982 requiring the parties to amend their contracts as aforesaid,

NOW, therefore, in consideration of the promises and the covenants herein made, the parties hereto agree that they should continue to be guided by the principles set forth in the Michigan Supreme Court decision in The City of Detroit v City of Highland Park, 326 Mich 78 (1949), referred to above, but except as provided therein, in order to make uniform the terms and conditions of service between Detroit and all suburban communities, the parties agree as follows:

1.   HIGHLAND PARK shall pay the BOARD for sewage treatment and disposal service at such rates as the BOARD may establish from time to time. The BOARD shall review the rates annually and shall adjust them as may be necessary to maintain a proportionate distribution of costs among user classes, and to generate sufficient revenue to pay the total costs of the sewage system. Rate adjustments shall be determined according to the following principles:

A.   Revenue Requirements. Revenue requirements shall be based upon the finances required to meet all operating, maintenance, capital requirements including debt financing and coverage, and any obligations imposed by law, and shall reflect not only recent cost experience but also a recognition of the reasonably estimated future cost levels during the period for which the rates are being established.

4

(1) Operating and maintenance expenses of
the system.

   (a) Operating and maintenance expenses
shall include replacement of pro-
cess equipment, accessories, or
appurtenances which are necessary
to maintain the capacity and per-
formance for which the treatment
works is designed and constructed.

   (b) The rate for operation and mainte-
nance expenses, including replace-
ment, shall include a factor to be
applied to the volume of sewage
delivered by HIGHLAND PARK, and
shall also include surcharges to
be applied to the discharges of
individual users whose loadings of
specified pollutants exceed normal
loadings. The BOARD shall specify
the pollutants to be surcharged,
and shall define normal loadings
of these pollutants.  The rate
shall conform to Section 204(b)(1)
(A) of Public Law 92-500, as
amended, and regulations of the
United States Environmental Pro-
tection Agency (hereinafter refer-
red to as the U.S. EPA), being 40
CFR, 35.929 through 35.929-3.

(2) Maximum Debt Financing.  The BOARD
shall obtain capital funds for the
expansion, renewal and reconstruction

of common use or solely suburban use major capital assets or improvements from the issuance of revenue bonds, to the maximum extent possible together with maximum use of coverage monies generated thereby. "Coverage" means the excess of revenues required to meet the coverage test over revenue requirements determined without respect to the coverage test. "Coverage Test" means the requirement imposed by Section 10 of Ordinance 517-E of the City of Detroit which provides that in the year of issuance of revenue bonds of standing equal to those presently outstanding, estimated net revenues shall be equal to at least one and one-half (1 1/2) times the largest amount of combined principal and interest to fall due in any future operating year on any bonds then payable out of the net revenues of the system, including such additional bonds then being issued. Detroit shall apply the principle of maximum debt financing set forth herein consistent with an interpretation of the additional bonds test which incorporates the following principles:

    (a)  Estimated investment income of the DWSD will not be included in determining revenues.

6

(b)   Future operating and main-
tenance expenses estimated to
result from the addition of
capital facilities for which
bonds are issued, shall be
included as an expense in
determining net revenues only
with respect to the periods
in which it is reasonably
estimated that they will be
incurred.  The parties
acknowledge that Detroit can
comply with the additional
bonds test by setting future
rates sufficient to defray
estimated future operation
and maintenance expenses in
the periods in which they
will be incurred.

(3)   Depreciation.  User charges shall not
reflect a charge for the depreciation
of physical assets, which together with
a rate of return and provision for
operation and maintenance expense would
generate revenues in excess of system
revenue requirements including coverage.

B.   Uniform Allocations of Costs Incurred.  The
recovery of costs incurred by the system
shall be accomplished through the institu-
tion of rates which assign, allocate and
apportion such costs to all ratepayers on

7

the basis of principles uniformly applicable
to all, it being the intention of the par-
ties that such rates (whether designed on
the utility or cash basis) will, as nearly
as is practical, recover from each customer
class the respective costs of providing ser-
vice regardless of the ratepayer's loca-
tion.   In particular:

(1)   If rates are based upon a system of
      charging a percentage rate of return on
      net asset or capital structure rate
      base, (through the use of the so-called
      utility basis of rate making) there
      shall be no differential in the rate of
      return charged to customers residing or
      located within the City of Detroit and
      customers residing or located without
      the City of Detroit.  Nothing herein
      contained shall prohibit the BOARD from
      designing its rates on the so-called
      cash basis.

(2)   If rates for the transportation charge
      to customers served by the Oakland-
      Macomb interceptor are based upon the
      utility basis with a percentage rate of
      return, such rate of return shall be
      the same as the rate of return charged
      to other customers of the system.
      Nothing contained herein shall prohibit
      the BOARD from employing the cash basis
      of ratemaking, including ratemaking for

8

customers served by the Oakland-Macomb interceptor. "Transportation Charge" means the aggregate of all costs assigned or allocated to contracting parties served by the Macomb-Oakland interceptor which are not costs incurred for service in common with other customers, including all costs of operation and maintenance, depreciation, and, to the extent rates are based on a rate of return or other charge based on plant value, the cost resulting from application of such charge or rate to the inceptor and related equipment.

(3) Should the cash basis be used in any future rate study, the allocation of debt service costs to all customers or facilities shall be based upon the system weighted average interest rate at the time.

(4) Surcharges shall be utilized to recover incremental operating, maintenance and replacement costs incurred in treating sewage which, at the point of discharge, contains specified pollutants in concentrations exceeding those of normal domestic sewage, as defined by the BOARD.

(5) All costs other than those costs recovered by surcharges as herebefore set forth, may be recovered by volume

alone, or by volume and surcharges, or by any method which provides a distribution of costs reasonably related to the service provided.

C.  Following the computation of rates for customers residing or located within the City of Detroit and customers residing or located without the City of Detroit pursuant to the principles set forth in this contract, such rates shall be further adjusted by deducting from the revenues to be charged customers within the City of Detroit and adding to the revenues to be charged customers without the City of Detroit, and making appropriate adjustments of the rates for sewage service to be charged to such customers, an amount determined as follows:

(1)  For the fiscal year 1981 (July 1, 1980 through June 30, 1981), such amounts shall be the sum of $1,102,500. For each fiscal year thereafter, such amount shall be increased by 5%, determined upon a compounded basis. For example, the amount for fiscal 1982 shall be the sum of $1,157,625. For fiscal 1983, this amount shall be the sum of $1,215,506, and similarly for succeeding fiscal years.

(2)  This payment shall be made, and rates so adjusted as a payment to reflect the cost of indirect benefits or services

10

provided by the City of Detroit to the BOARD for common use facilities within the City of Detroit, such as police and fire protection, the risk of tort liability, the loss of tax base that the City loses as a result of the BOARD's tax exemption, and the fact that the suburbs receive sewage treatment without having to devote any of their land to a tax free utility.

(3)   In the event that the City of Detroit shall at any time hereafter render billings or accounting statements for indirect services to the BOARD such as police and fire protection, risk of tort liability, loss of tax base or any other type of contribution in lieu of taxes with the effect that such billings or statements become part of the BOARD budget for ratemaking purposes, then the amount of such charges allocated or apportioned to the contracting customers shall be deducted from the amount determined pursuant to subsection 5.C.(1) above, and shall in no event exceed the amount determined pursuant to subsection 5.C.(1) above.

D.   The amount charged to the suburbs for payment for indirect benefits and services set forth in Paragraph 5.(c) above shall be allocated among suburban customers in the

11

same manner in which treatment costs are allocated.

E.   The BOARD may continue to include in its rates charges for direct services which the City currently renders and bills to the BOARD.  Such "direct services" shall be limited to the kind of services historically provided by offices, departments or agencies of the City of Detroit such as various kinds of licenses and permits, electricity, steam, water, paving, vehicles, and rubbage pickup; the Ombudsman, the cost of which will be allocated between the customers within the City of Detroit and the customers without the City of Detroit based upon the proportionate number of complaints or inquiries by each such class of customers; and those which were included in the BOARD's budget for fiscal 1978.

No additional charges may be made for "direct services" provided by other or additional City offices, departments and/or agencies without the prior agreement of the contracting parties.  Such agreement shall not be unreasonably denied or delayed should it appear that the particular service or services result in a legitimate, direct benefit to the system and its customers.

F.   Whenever the BOARD shall undertake any study which may result in the revision of rates,

12

including any study relating to industrial cost recovery charges, user charges, or other matters relating to the requirements of P. L. 92-500, 33 U.S.C.A. 1251 et seq. as amended, it shall notify the appropriate agents of Oakland, Wayne and Macomb Counties, and its other contract customers of such study, and shall, during the course of any such study, make available, upon request, to such contract customers, their agents, consultants and attorneys, any interim or preliminary reports and final reports prepared in the course of such study.

In conjunction with furnishing the aforesaid reports, the City of Detroit and its consultants at the request of the contracting parties will have a conference with the contracting parties and representatives in order to explain and discuss the reports being provided. The requesting party shall reimburse the BOARD for any out-of-pocket costs incurred in meeting such request. Nothing contained herein shall require the City of Detroit to undertake any activity which may impede it in complying with the requirements of the consent judgment dated September 14, 1977 or other orders of the Court entered pursuant to P. L. 92-500, 33 U.S.C.A. 1251, et seq, as amended. In addition, such presentation will be done in a manner, place, and time mutually convenient

13



to all of the parties involved including the City of Detroit's consultants.

2. HIGHLAND PARK agrees that it shall adopt and enforce rules and regulations to implement and maintain a revenue system whereby, as a minimum, the operation, maintenance and replacement portion of the BOARD's rates are distributed proportionately to each user or user class that is tributary to the BOARD's treatment works. In particular, these rules and regulations shall provide that surcharges established by the BOARD for the recovery of incremental operation, maintenance and replacement costs of treating extraordinary concentrations of sewage, shall be billed to and collected from individual firms as identified by the BOARD in its billings. These rules and regulations shall conform to Section 204(b)(1)(A) of Public Law 92-500, as amended, and regulations of the United States Environmental Protection Agency (hereinafter referred to as the U.S. EPA), being 40 CFR, 35.929 through 35.929-3, and shall achieve a proportionate User Charge System which is effective throughout the BOARD's service area. The rules and regulations shall provide for monitoring of commercial, governmental and industrial users and shall be consistent with the monitoring rules and regulations of the City of Detroit. The Board shall have the right under said rules and regulations to audit all monitoring activities including the right to perform monitoring tests itself to verify the accuracy of monitoring results.

14

3.   HIGHLAND PARK agrees that it shall adopt and enforce rules and regulations pertaining to the use, design and construction of sewers, and the discharge of industrial or commercial wastes into sewers, where such sewers are tributary to the BOARD's treatment works.  Such rules and regulations shall be consistent with and at least as stringent as all applicable provisions of the pertinent ordinances adopted by the City of Detroit, these being the 1979 amendments to Chapter 56, Article 1, and Chapter 56, Article 6, of the Municipal Code of the City of Detroit as they may be adopted and amended from time to time.  In the event any municipality or other governmental unit shall fail to adopt an ordinance as required herein, or shall fail to diligently enforce the same, the BOARD shall take appropriate action which may include suit in an appropriate court of general jurisdiction alleging such municipality's failure to adopt or enforce an ordinance, and following a hearing on the merits, should the court find that the allegations in the BOARD's petition are true, it is agreed that such court may, in such instance, grant appropriate injunctive relief against said municipality or any individual discharger there; terminate the municipality's contractual right to discharge waste waters into the BOARD's system and/or to grant the BOARD such other relief as may be appropriate under the circumstances.  These actions shall enable the BOARD to:

15



A.    Deny or condition new or increased contributions of pollutants or changes in the nature of pollutants, to the waste collection system by Industrial and Commercial Users. The terms "Industrial and Commercial" user shall mean those users defined in Section 56-6-3(H) and (P) of Detroit Ordinance No. 353-H of Chapter 56 of Article 6 passed on November 7, 1979 and as may be amended from time to time.

B.    Require compliance with applicable current and future National Pretreatment Standards and other more restrictive requirements as may be imposed by the BOARD promulgated by the U.S. EPA under the Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq.

C.    Control, through permit, contract order, or similar means, the contribution to the waste collection system by Industrial and Commercial Users to ensure compliance with paragraph B above.

D.    Require the development of compliance schedules by Industrial and Commercial Users for the installation and facilities required to meet applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by the BOARD.

16



E.   Require the submission of notices and self-monitoring reports from Industrial and Commercial Users to assess and assure compliance with National Pretreatment Standards and other more restrictive requirements as may be imposed by the BOARD.

F.   Carry out all inspection, surveillance and monitoring procedures necessary to determine, independent of information supplied by Industrial and Commercial Users, compliance or noncompliance with applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by the BOARD.  It being further understood that the BOARD may contract with qualified parties to carry out the inspection, surveillance and monitoring procedures of this paragraph.

G.   Seek injunctive relief for noncompliance with National Pretreatment Standards and other more restrictive requirements as may be imposed by the BOARD.

H.   Require Industrial and Commercial Users to install containment facilities to protect the treatment works from accidental spills of critical or hazardous materials.

4.   This amendment shall inure to the benefit of and be binding upon the respective parties hereto, their successors and assigns.

17



5.   This amendment shall take effect upon its

adoption and execution by the respective parties here-

to, its approval by the City Council of the City of

Detroit, and its approval by the appropriate authori-

ties of the City of Highland Park.

Witness (Highland Park)

_Jean Green_ (signed)

_Jean Green, City Clerk_ (typed)

Witness (Highland Park)

_Leonard Ralph Lipkin_ (signed)

_Leonard Ralph Lipkin_ (typed)

_Dep City Clerk_

Witness (Board of Water Commissioners)

_Phyllis Fuller_ (signed)

_PHYLLIS FULLER_ (typed)

Witness (Board of Water Commissioners)

_Rita L. Madison_ (signed)

_RITA L. MADISON_ (typed)

FINANCE DEPARTMENT

No. _____ Date _____ I here-
by certify that an appropriation has
been made to cover the expense to be
incurred under this contract.

_____
Chief Accounting Officer

The original and ____ copies of this
contract have been duly executed.

This contract was confirmed by the
Detroit City Council

_____   _____
        Date                Page

HIGHLAND PARK
A Michigan Municipal Corporation

By _Robert B Blackwell_ (signed)

Robert B Blackwell, Mayor _____ (typed)

Title _____

Address _____

      _____

      _____

Telephone Number _____

OK as to form
_____

THE CITY OF DETROIT
A Michigan Municipal Corporation, by
its Board of Water Commissioners

By _Charlie J Williams_ (signed)

CHARLIE J. WILLIAMS, DIRECTOR (typed)

Title _____

Address  735 Randolph Street

      Detroit, Michigan 48226

      _____

Telephone Number  313-224-4701

LAW DEPARTMENT

Approved as to form and execution
subject to approval by the Purchasing
Director and the City Council

_____
Corporation Council

Purchasing Department for the City
of Detroit

_____
Purchasing Director

_Jeffrey D Blaine_

ATTEST JEFFERY D. BLAINE
DEPUTY CITY CLERK

WATER:

202   The following communication was received from the Water Director:

"Pursuant to the order dated 4-15-82 of the United States District Chief Judge John Feikens, we are required to enter into a Service contract with the City of Detroit for the Sewage treatment of our waste water.

Would your Honorable body authorize the Mayor and the City Clerk, to sign the attached agreement with the City of Detroit, as required by Court Order."

Moved by Councilman Daboul
Supported by Councilman Davis

That the Mayor and the City Clerk be authorized to sign the Sewage Service Contract with the City of Detroit, as required by Chief Judge John Feikens' order.  Yeas, (4); Nays, (0); Absent, (1).

***



STATE OF MICHIGAN }
COUNTY OF WAYNE  } ss.
CITY OF HIGHLAND PARK }

I, Jean Green, Clerk of the City of Highland Park, do hereby certify that the annexed is a true copy of C.I. 202 of the Recessed and Regular Council Meeting pertaining to the signing of the Sewage Service Contract with the City of Detroit as required by Chief Judge John Feikens' Order

as appears by the files and records in my office, that I have compared the same with the original and it is a true transcript therefrom and of the whole thereof.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of the City of Highland Park this 8th day of June 1983.

Jean Green    City Clerk